# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-25-474-PRW |
| | ) | |
| ISAIAS ALVAREZ SALAZAR, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Isaias Alvarez Salazar's Motion to Suppress (Dkt. 27), requesting an order suppressing all evidence obtained during the October 26, 2025 traffic stop. The Motion has been fully briefed and an evidentiary hearing was held. For the following reasons, the Court **GRANTS** the Motion (Dkt. 27).

### *Background*

On a Sunday morning along the western edge of Oklahoma City, Isaias Salazar was driving east on Interstate 40 in a California-tagged Ford Escape. Deputy Christopher Flemming of the Oklahoma County Sheriff's Office, on duty with a special task force devoted to drug interdiction, followed behind him in the center lane. When Salazar signaled and moved into the right lane, Deputy Flemming concluded he had witnessed a traffic violation: a lane change, he would later say, unaccompanied by the 100 feet of prior signaling that Oklahoma law requires. The emergency lights came on, and Salazar pulled to the shoulder.

1

What followed would have been, for most motorists, an unremarkable few minutes and a warning or a citation. It was not that for Salazar. Deputy Flemming placed him in the front seat of the patrol car, peppered him with questions about his travel plans and about contraband, and told him that, as a California resident, he would be arrested and taken to jail if cited for the traffic infraction. He asked, repeatedly, for consent to search the Ford Escape. Salazar, just as repeatedly, declined.

Suspicious that Salazar was trafficking drugs, Deputy Flemming called for backup. Once it arrived, he deployed his drug-detection dog (K9 Gofer) for an open-air sniff of the vehicle. The dog was trained to alert to cocaine, heroin, methamphetamine, and marijuana. Deputy Flemming reported an alert and searched the car. What he found concealed inside was none of the four substances the dog was trained to detect. It was a large quantity of fentanyl.

Salazar was arrested. On November 18, 2025, a grand jury returned a one-count indictment charging him with possession of more than 400 grams of fentanyl with intent to distribute.[1] He moved to suppress both the physical evidence recovered from the Ford Escape and the recorded statements he made while seated in Sergeant Barton's patrol car.[2] At the hearing, he abandoned the challenge to his statements. What remains are three

[1] Indict. (Dkt. 14).

[2] Mot. to Supp. (Dkt. 27).

contentions: Deputy Flemming had no lawful basis to stop him, no reasonable suspicion to prolong the stop for an open-air sniff, and no probable cause to search his vehicle.

### *The Evidence*

The following more detailed recitation of the material facts is derived from the bodycam footage and the hearing testimony of Deputy Flemming and Lieutenant Jason Hefley.

### I.    The Bodycam Footage

Deputy Flemming initiated the traffic stop at approximately 9:57 a.m.[3] After Salazar pulled to the shoulder, Deputy Flemming approached the Ford Escape's passenger window and made contact with Salazar, who provided a California driver's license and proof of insurance.[4] Deputy Flemming then directed Salazar to sit in the passenger seat of his patrol car.[5] As Salazar exited his car to make his way to the patrol car, Deputy Flemming asked him if his car was a rental. Salazar explained that the Ford Escape was a fleet vehicle for Hewlett Packard, his employer.[6] Deputy Flemming told Salazar he had pulled him over for failing to signal for at least 100 feet before changing lanes. Salazar explained that he had changed lanes because he thought Deputy Flemming was trying to pass him.

---

[3] Bodycam Footage (Dkt. 36-2), at 00:00–00:36. Deputy Flemming's patrol unit did not have an operational dash camera, so there is no video footage of the disputed lane change.

[4] *Id.* at 00:47–1:14.

[5] *Id.* at 1:30–1:32.

[6] *Id.* at 1:54–1:58.

Deputy Flemming asked Salazar if he had any weapons on him and quickly patted him down to confirm. Once Salazar and Deputy Flemming were seated in the patrol car, Flemming began verifying Salazar's license and registration on his laptop computer. While doing so, Deputy Flemming began quizzing Salazar about his travel plans.

> **Deputy Flemming:** You still live out in Sacramento?
>
> **Salazar:** Yes, I do.
>
> **Deputy Flemming:** Okay. And where are we headed to out here?
>
> **Salazar:** Here to Oklahoma City.
>
> **Deputy Flemming:** You're coming here to Oklahoma City?
>
> **Salazar:** Yeah.
>
> **Deputy Flemming:** And you're here for Hewlett-Packard, you said?
>
> **Salazar:** Yeah, I work for Hewlett-Packard, yes.
>
> **Deputy Flemming:** How long are you stuck in Oklahoma City?
>
> **Salazar:** I think the project is like 2-3 days.
>
> **Deputy Flemming:** Okay.
>
> **Salazar:** We are doing an acquisition.
>
> **Deputy Flemming:** From who?
>
> **Salazar:** Acquisition?
>
> **Deputy Flemming:** Yeah.

4

> **Salazar:** Oh, it's like a dealership. So we are gonna change out all their computer stuff.
>
> **Deputy Flemming:** I gotcha. What's the company name here?
>
> **Salazar:** Lithia. Lithia is the group, yeah.
>
> **Deputy Flemming:** The company, like the dealership you're going to here?
>
> **Salazar:** Uh, it's a Ford dealership. Let me see, I'll have to look it up.[7]

Salazar then searched for the name on his phone and then told Deputy Flemming that the dealership was Metro Ford of OKC.[8] Deputy Flemming testified that he found suspicious Salazar's inability to immediately recall the name of the dealership and use of his phone to refresh his memory.[9]

At this point, a few minutes into the stop, Salazar seemed surprised by a sound coming from the backseat and noticed Deputy Flemming's CLEET-certified canine, Gofer, rustling in the back of the patrol car; Salazar commented on the dog.[10] Deputy Flemming told Salazar that Gofer was his drug dog. Salazar told Deputy Flemming, "I've never actually been in a police vehicle before" because "they don't do that [put drivers in the

---

[7] *Id.* at 2:38–3:35.

[8] *Id.* at 3:35–3:47; Deputy Flemming observed Salazar use his phone to search for the name car dealership. Incident Rep. (Dkt. 36-1), at 1.

[9] Apr. 10, 2026 Hr'g Audio at 10:28 a.m. (recording with the Court).

[10] Bodycam Footage (Dkt. 36-2), at 3:48.

police car] in California."[11] Deputy Flemming responded by telling Salazar, "we do it here."[12]

Deputy Flemming then continued his questioning of Salazar:

> **Deputy Flemming:** How long have you had this car?
>
> **Salazar:** Uh, refresh my memory, like two years. So, like 2023, two years.
>
> **Deputy Flemming:** I gotcha. Any trouble with your license? Any major tickets?
>
> **Salazar:** Nothing.
>
> **Deputy Flemming:** No incarcerations, no probation?
>
> **Salazar:** Nothing.
>
> **Deputy Flemming:** Okay. You said you still live in Sacramento?
>
> **Deputy Flemming:** Are you coming straight from Sacramento?
>
> **Salazar:** No, we were at a project down in Anaheim.
>
> **Deputy Flemming:** Okay. Just yourself?
>
> **Salazar:** Yes.
>
> **Deputy Flemming:** Okay. And then you come out here and do this yourself?
>
> **Salazar:** Yeah, we finished up there, yeah. I'm bringing the equipment. I apologize if I did something wrong, I wasn't sure.

---

[11] *Id.* at 4:10–4:18.

[12] *Id.* at 4:21.

**Deputy Flemming:** It was just the lane change.[13]

Deputy Flemming had by this time checked the registration for the company car Salazar was driving and based on that computer check believed the car's registration was expired, even though the registration papers Salazar had given him showed a valid 2026 registration and the car's license plate had a 2026 registration sticker.[14]  He asked Salazar about this:

> **Deputy Flemming:** When did you update the sticker on the car?
>
> **Salazar:** They sent it to me.
>
> **Deputy Flemming:** They sent it to you?
>
> **Salazar:** I mean, the fleet company mails it to me.
>
> **Deputy Flemming:** Okay. What I'm showing is a '24. Not a '26. Like that tag's been expired since '24, so they might have messed up.  Where do you pick up the cars at?
>
> **Salazar:** They usually deliver it to the closest Ford dealership to my house, but the registration is up to date.
>
> **Deputy Flemming:** But the California system's not.
>
> **Salazar:** Oh.
>
> **Deputy Flemming:** And you got this [the registration paperwork] from California, I assume, right?
>
> **Salazar:** Yeah.

---

[13] *Id.* at 4:26–5:17.

[14] *Id.* at 5:40–6:05.

**Deputy Flemming:** I don't know why they haven't updated it or something. Yeah, because what I see is, bought the car on September '23, registered it September '23, and this expiration for the car is expired on, it said registration valid from 9/23 to 9/24.

**Salazar:** Yeah, I don't know why that is. I called the fleet company and let them know.

**Deputy Flemming** Maybe they registered the wrong car.

**Salazar:** I haven't been stopped in . . . ever. So it never came up as an issue.

**Flemming:** I got you.[15]

Deputy Flemming then returned to quizzing Salazar about his travel plans yet again asking Salazar about how long he would be in Oklahoma City. Salazar told Deputy Flemming, "I think it's going to be three days, three or four days." Deputy Flemming then asked Salazar if his employer had gotten him "a hotel or anything here" and Salazar responded, "I'm gonna get one right now at the Hilton."[16] Deputy Flemming testified that he found the fact that Salazar hadn't booked a hotel yet suspicious because he (Deputy Flemming) never travels long distances without booking a hotel ahead of time.[17]

---

[15] *Id.* at 5:23–7:03.

[16] *Id.* at 7:05–7:17.

[17] Apr. 10, 2026 Hr'g Audio at 10:34–10:35 a.m.

Deputy Flemming then indicated he would check the car's VIN to see if he could resolve the registration issue and he explained to Salazar this sort of registration problem wasn't uncommon with fleet vehicles.[18] Deputy Flemming then told Salazar the following:

> **Deputy Flemming:** My advice to you here is don't get a ticket when you're a California resident, especially out of state because California doesn't do compacts with a lot of states. It means if I write you a ticket here and you go back to California. and you don't pay or [if I] arrest you here and you don't come back, they're not gonna . . . extradite you back. So what would happen would be if I was to write you a ticket, I'd just take you to jail here. Just to make you aware of that, okay?[19]

Salazar reacted to this news by looking at Deputy Flemming with alarm and saying "holy cow" and that Deputy Flemming was making him "really nervous."[20]

Deputy Flemming then began quizzing Salazar about what he was transporting:

> **Deputy Flemming:** And what are you transporting with you today?
>
> **Salazar:** Just computer equipment.
>
> **Deputy Flemming:** It's all computer equipment?
>
> **Salazar:** Yeah, hard drives, printer parts.[21]

Deputy Flemming then turned back to Salazar's travel plans:

> **Deputy Flemming:** When do you gotta show up to the dealership?

---

[18] Bodycam Footage (Dkt. 36-2), at 7:24–7:30.

[19] *Id.* at 7:34–8:10.

[20] *Id.* at 8:11–8:13.

[21] *Id.* at 8:18–8:30.

> **Salazar:** I'm gonna check in, hopefully get some rest, and then tomorrow morning. I'll check in today just to let them know I'm here.[22]

Although Salazar said he was going to the dealership the next morning (Monday) to start work, Deputy Flemming testified that he found Salazar's answer that he was going to "check in today just to let them know I'm here" suspicious because it was Sunday and car dealerships in Oklahoma are closed on Sundays pursuant to state law.[23]

Deputy Flemming then returned the conversation to what Salazar was transporting:

> **Deputy Flemming:** And that's all you're carrying with you, just the computer parts, your luggage, stuff like that?
>
> **Salazar:** Yeah.
>
> **Deputy Flemming:** You're not transporting anything from California other than that, correct?
>
> **Salazar:** No.
>
> **Deputy Flemming:** Nobody asked you to transport anything?
>
> **Salazar:** No. Absolutely not.
>
> **Deputy Flemming:** Okay. There's nothing in there like methamphetamines?
>
> **Salazar:** No.
>
> **Deputy Flemming:** Any prescription drugs?
>
> **Salazar:** No.

---

[22] *Id.* at 8:38–8:54.

[23] Apr. 10, 2026 Hr'g Audio at 10:36 a.m.

**Deputy Flemming:** Heroin?

**Salazar:** No.

**Deputy Flemming:** Cocaine?

**Salazar:** No.

**Deputy Flemming:** Or any large amounts of marijuana?

**Salazar:** No sir.

**Deputy Flemming:** Any large amounts of U.S. currency in the vehicle?

**Salazar:** Mm uh [nodding no].

**Deputy Flemming:** Anything over like over $10,000?

**Salazar:** No sir.

**Deputy Flemming:** Okay. And nothing my dog would alert to, correct?

**Salazar:** No.

**Deputy Flemming:** No?

**Salazar:** [nodding no].

**Deputy Flemming:** Would you object to me searching your vehicle?

**Salazar:** Yeah. I don't see why. No.

**Deputy Flemming:** I can?

**Salazar:** Why would you want to search my vehicle? I'm not doing anything wrong.

> **Deputy Flemming:** I didn't say you were doing anything wrong. So that's a no?
>
> **Salazar:** Yeah. No.[24]

Although Deputy Flemming had just assured Salazar that he hadn't accused him of doing anything wrong, he then shifted to explaining to Salazar why he suspected that Salazar was, in fact, doing something wrong. Deputy Flemming later testified that he had already decided to run his drug dog on Salazar's car before asking for his consent to do so, due to his suspicion that Salazar was engaged in some sort of criminal activity.[25]

> **Deputy Flemming:** The reason why I bring up these questions is you seem super nervous. Like, you're like, you're next to me and you're forcing yourself to breathe.
>
> **Salazar:** Oh, okay.
>
> **Deputy Flemming:** Like, you're like, over here. Like panting. Panting. Like you're . . . it seems difficult.
>
> **Salazar:** Yeah.
>
> **Deputy Flemming:** And I ask you questions and you don't look at me.
>
> **Salazar:** I'm sorry. It's a different state.
>
> **Deputy Flemming:** I feel you. You're not going to jail for a ticket. I'm not going to write you a ticket. It's a $200 ticket for improper lane change.
>
> **Salazar:** Okay.

---

[24] Bodycam Footage (Dkt. 36-2), at 9:20–10:36.

[25] Apr. 10, 2026 Hr'g Audio at 10:40 a.m.

**Deputy Flemming:** But I'm not going to do that.

**Salazar:** Yeah, because when you said that about the . . .

**Deputy Flemming:** (interrupting) I'm not going to take you to jail for it. You were nervous before, when you got in here.

**Salazar:** I'm sorry.

**Deputy Flemming:** You said there's nothing in that vehicle?

**Salazar:** No.

**Deputy Flemming:** Nothing he's going to alert to?

**Salazar:** No.

**Deputy Flemming:** 100%?

**Salazar:** Yeah.

**Deputy Flemming:** And everything in the vehicle belongs to you?

**Salazar:** Yes.

**Deputy Flemming:** Besides the company products?

**Salazar:** Yeah. The products. It's a company vehicle. Yeah.

**Deputy Flemming:** Alright. You said I cannot search your vehicle?

**Salazar:** No.

**Deputy Flemming:** Okay. You care if I run the dog on the vehicle, see if he alerts to it?

**Salazar:** I do not consent to that, no.

**Flemming:** Okay.[26]

Deputy Flemming then made a radio call for another unit to come to the scene. Deputy Flemming testified that he did so in order to transfer Salazar to another unit so that he could deploy his drug dog on Salazar's car. While waiting, Salazar again expressed confusion as to why Deputy Flemming wanted to search his vehicle:

> **Salazar:** I don't see why it's necessary.
>
> **Deputy Flemming:** It's just, your travel is pretty quick. You had to look up a dealership on your phone to know where you're going out here. You're super nervous. You had to use your phone to look up a dealership to know where you're going. But you drove all the way across the country not knowing where you're working. So like, if I leave California, which is 17 hours away . . . I've got an idea of where I'm going and what I'm doing. And if I'm doing nothing wrong, I'm not nervous. You're next to me and you have to force yourself to take a breath. You feel me?
>
> **Salazar:** Yeah, but you made me nervous . . .
>
> **Deputy Flemming:** [interrupting] I shouldn't make you nervous. I'm just another dude, right? Like, you're not wanted.[27]

Deputy Flemming then told Salazar that he was going to complete a warning for the traffic violation and when backup arrived, "we'll go from there" with an open-air sniff. Sergeant

---

[26] Bodycam Footage (Dkt. 36-2), at 10:45–11:55.

[27] *Id.* at 12:14–13:12.

Justin Barton arrived on scene moments later, roughly two minutes after Deputy Flemming had first requested backup.[28]

The bodycam footage reveals that from this point forward, the original mission of the stop (and any investigation into the potentially expired tag) was abandoned and the officers focused their activities entirely on investigating possible drug trafficking. Deputy Flemming told Salazar that he would be placed in Sergeant Barton's vehicle while Deputy Flemming performed a canine sniff of Salazar's car. Deputy Flemming then informed Salazar that he didn't need his consent to do the canine sniff but told Salazar he'd asked him for consent because he "just wanted to see what you said . . . which is another thing I do. You understand? Like, you don't even want me running the dog."[29]

Deputy Flemming then escorted Salazar to Sergeant Barton's patrol vehicle and placed him in the backseat. After doing so, Deputy Flemming explained to Sergeant Barton why he was suspicious of Salazar:

> **Deputy Flemming:** Can I search? 'No, no, no.' Can I run the dog? 'No.' Said he was coming out here to do some computer work at a dealership and had to use his phone to lookup a dealership.[30]

---

[28] *Id.* at 14:41.

[29] *Id.* at 14:23–14:34.

[30] *Id.* at 15:46–16:03.

Deputy Flemming then began the free-air sniff around the Ford Escape, with Gofer, his drug dog.[31] Deputy Flemming testified that Gofer is a very energetic dog, and that is apparent from the bodycam footage. Deputy Flemming testified that Gofer is trained to detect the odor of cocaine, heroin, methamphetamine, and marijuana, and Gofer is trained to alert his handler to smells of one of those substances by sitting where the odor is the strongest. [32]

When Deputy Flemming deployed Gofer on Salazar's Ford Escape, they began on the passenger side of the car. The dog sniffed the car and jumped up to sniff the crack between the front and rear passenger doors. The dog then moved to the rear of the car, then returned to the passenger side, again sniffing the crack between the front and rear passenger doors, and also jumping up to sniff the crack at the back of the rear passenger door. The dog then moved to the front of the car and then to the driver's side and then back to the front of the car. The dog worked his way back and forth the length of the driver's side several times, twice jumping up to sniff cracks on doors.

Returning to the rear of car, Gofer appeared to attempt to head back to Deputy Flemming's patrol car, but Deputy Flemming directed him back to the Ford Escape and the dog again sniffed along the passenger side of the car. The dog again jumped up to sniff the crack between the front and rear passenger side doors, and this time paused and looked

---

[31] *Id.* at 16:53.

[32] Apr. 10, 2026 Hr'g Audio at 10:17 a.m.

at Deputy Flemming, who backed away from the dog as far as the leash would allow. The dog did not sit. He instead again attempted to return to Deputy Flemming's patrol car.

Deputy Flemming again redirected the dog back to the car, where the dog again sniffed the passenger side thoroughly while occasionally jumping up to sniff the higher parts of the car. Again, the dog never gave a "sit" alert, and again tried to return to the patrol car.

At the hearing, Deputy Flemming explained what he perceived was happening during this sequence of events. According to Deputy Flemming, while Gofer is trained to sit to indicate an alert, Gofer is a "fast moving" dog who sometimes needs direction.[33] Deputy Flemming gave several reasons why Gofer might not sit, such as if there was an obstruction or tight space or bad weather that prevented him from doing so, but Deputy Flemming acknowledged that nothing at this scene prevented Gofer from sitting.

According to Deputy Flemming, although Gofer's only trained alert signal is a sit, Deputy Flemming considers certain behavioral changes other than sitting to be an alert.[34] For example, if Gofer pauses at a particular location or if his breathing or "body structure" changes at a location, Deputy Flemming considers that an alert, even if Gofer never sits.[35] And here, explained Deputy Flemming, he believed Gofer had shown particular interest in

---

[33] *Id.* at 10:44–10:46 a.m.

[34] *Id*. at 10:18 a.m.

[35] *Id*. at 10:44–10:46 a.m.

the crack between the front and rear passenger doors, and considered this an alert. [36] Gofer had attempted to return to the car, explained Deputy Flemming, because he gets a reward (a ball to play with) after an alert that is confirmed by a search.[37]

All this to say, Deputy Flemming explained his actions with Gofer as his attempt to get Gofer to give the alert he is trained to give, i.e., to sit. This is why Deputy Flemming kept redirecting Gofer back to the car and back to the area where he believed Gofer had alerted. In Deputy Flemming's words, "I want Gofer to do what he's trained to do and come to a sit."[38] Sometimes, clarified Deputy Flemming, he accomplishes this by "body blocking" Gofer, which "slows him down enough to know that, okay, this is where I focused all my attention before, I smelled something here, and then, oh, I forget I have to sit."[39] In other words, Deputy Flemming has a technique for getting Gofer to sit when Deputy Flemming believes Gofer should have but hasn't.

So Deputy Flemming yet again redirected the dog back to the car, where the dog again sniffed up and down the back and passenger side of the car, with Deputy Flemming using his hand to direct the dog where he wanted him to sniff. The dog worked up and down the passenger door without alerting until Deputy Flemming pointed him to the crack between the front and rear passenger doors, at which time Gofer jumped up on his back

---

[36] *Id.* at 10:44–10:47 a.m.

[37] *Id*. at 10:45 a.m.

[38] *Id.* at 10:45 a.m.

[39] *Id*. at 10:46 a.m.

legs onto the side of car and looked at Deputy Flemming, who again backed away from the dog as far as the leash would allow. Finally, Gofer sat. Having gotten the final alert he wanted, Deputy Flemming praised the dog with "good boys" and remarked "same spot" as he led the dog back to his patrol car. Deputy Flemming then informed Sergeant Barton that the dog had alerted on the car.

Deputy Flemming began searching the car. He started in the back seat of the passenger side of the car. After going through Salazar's belonging and finding nothing unusual, he eventually moved to the front passenger seat, and using a tool, looked in the door panel near where Gofer had alerted. Again finding nothing, he moved to the center console and floorboard, and then eventually to the glove box, where he discovered a bundle of white powder, which appeared to be drugs. [40] He then placed Salazar under arrest and continued his search of the car. [41]

While doing so, another officer, Lieutenant Hefley, arrived on scene. Like he had done with Sergeant Barton, Deputy Flemming explained to this officer what had aroused his suspicions:

> **Deputy Flemming:** He told me he was coming here to work. I said, 'well, which place are you going to work?' Pulls out his phone, [Salazar says] 'going to Metro Ford.' I said, 'you're going to Metro Ford? When do you have to check in?' [Salazar says] 'Uh, after I settle in. I'll call them.' I said, 'Bro, you alright?' I said, 'You can't breathe. You're over here having to force yourself to breathe." [Salazar says] 'Yeah, I'm fine.' I

---

[40] Bodycam Footage (Dkt. 36-2), at 19:21, 23:28–24:39 & 25:05–26:35.

[41] *Id.* at 19:21, 23:28–24:39 & 25:05–26:35.

said, 'You have anything in the car?' We go through all that. I
go like, 'Can I search your car?' [Salazar] goes, 'I just don't.
There's no need.' I said, 'Okay.' I said, 'Can I run my dog?'
[Salazar says] 'No.' I said, 'Alright.'[42]

Lieutenant Hefley seemed amused by Salazar's refusal to consent and quipped, "Well,
I'm gonna run the dog anyways."[43] The officers laughed.[44]

Lieutenant Hefley also had his drug dog (K9 Geri) on scene. He testified that he
decided to do a "roadside training run" with his dog, which is where the dog is deployed
on a scene where the officer already knows drug are present, to determine whether the dog
will alert to those drugs.[45] Lieutenant Hefley testified that, like Gofer, his dog was trained
to detect the odor of cocaine, heroin, methamphetamine, and marijuana.[46] And just like
Gofer, his dog was trained to alert by sitting where he detected the strongest odor.[47]
Lieutenant Hefley ran his dog on Salazar's car (whose front passenger side window was
now rolled down), but the dog never sat. [48] But like Deputy Flemming, Lieutenant Hefley

---

[42] *Id.* at 29:20–29:59.

[43] *Id.*

[44] *Id.*

[45] Apr. 10, 2026 Hr'g Audio at 11:27 a.m.

[46] *Id.* at 11:28 a.m.

[47] *Id*. at 11:29 a.m.

[48] *See* Geri Training Log (Dkt. 36-5), at 1.

testified that he interpreted his dog's behavior as having alerted on the same area as Gofer because he believed his dog showed particular interest in that front passenger door area.[49]

The Ford Escape was towed and later searched further, ultimately revealing a total of 48.87 pounds of fentanyl packaged in about twenty bundles hidden mostly on the rear driver's side of the cabin.[50] No heroin, methamphetamines, cocaine, or marijuana was found in the car.

## II.    April 10th Suppression Hearing

Bearing the burden of establishing the lawfulness of the traffic stop, the open-air sniff, and the subsequent search, at the hearing on this motion the Government put on two witnesses and introduced a number of documents.

### A.    Deputy Flemming's Testimony

The Government called Deputy Flemming as its first witness. Deputy Flemming has worked in law enforcement for roughly ten years.[51] At the time of the disputed stop, Deputy Flemming had worked on the Criminal Interdiction Team of Central Oklahoma for two years, conducting about 1,400 traffic stops.[52] Deputy Flemming also detailed his

---

[49] Apr. 10, 2026 Hr'g Audio at 11:37 a.m.

[50] Resp. (Dkt. 36), at 7–8.

[51] Apr. 10, 2026 Hr'g Audio at 10:11–10:14 a.m.

[52] *Id.* at 10:22 a.m.

experience with canine handling.[53] Both he and Gofer are CLEET-certified.[54] CLEET, or the Council on Law Enforcement Education & Training, is the official body that handles drug dog certification in Oklahoma.[55] In addition to the CLEET basic training course, Deputy Flemming said he performed routine maintenance training with Gofer for an average of about twelve hours each month.[56] Deputy Flemming also testified to the facts shown in his bodycam footage, providing insight into his thought processes during the October 26th stop.

Deputy Flemming explained why he became suspicious that Salazar was a drug trafficker. Salazar was driving a car he did not own, which Deputy Flemming associated with drug traffickers who use vehicles they do not own to avoid losing personal property if arrested.[57] Salazar had traveled all the way from California to "change out some computer parts," which Deputy Flemming found "odd."[58] He also needed to search for the name of a dealership and appeared to choose one of the first names that came up on his

---

[53] *Id.* at 10:14–10:18 a.m.

[54] *Id.* at 10:14–10:18 a.m. While Deputy Flemming provided testimony about Gofer's CLEET-certification and training, he did not testify as to any training or certification relating to "alerts" other than the trained alert (the sit). The Court is thus left with no evidence of the reliability of the sort of subjective alerts that Deputy Flemming claimed happened here (i.e., Gofer's "change in body structure" and change in breathing around the front passenger door).

[55] *Id.* at 10:14–10:18 a.m.

[56] *Id.* at 10:14–10:18 a.m.

[57] *Id.* at 10:25 a.m.

[58] *Id.* at 10:26 a.m.

phone, suggesting he might have been improvising his story.[59] And during the stop, Deputy Flemming claimed Salazar blinked rapidly, avoided eye contact, and struggled to breathe, which made him appear more nervous than the average motorist.[60] In addition, Salazar had not yet booked a hotel, something Deputy Flemming found odd based on his own travel habits.[61] Finally, Salazar said he might "check in" at a dealership that day, even though the stop occurred on a Sunday, when dealerships in Oklahoma are required by law to be closed.[62] Deputy Flemming testified that based on those facts, by the time he asked Salazar if he was transporting any narcotics in his vehicle, Deputy Flemming already had reasonable suspicion that Salazar was a drug trafficker.[63]

Lastly, Deputy Flemming described the canine sniff and subsequent physical search of the Ford Escape. In particular, Deputy Flemming elaborated on why he believes Gofer didn't sit initially, why he believed Gofer had alerted prior to sitting, and his efforts to get Gofer to give his trained final alert.[64]

---

[59] *Id.* at 10:28 a.m.

[60] *Id.* at 10:30 & 10:35 a.m.

[61] *Id.* at 10:34–10:35 a.m.

[62] *Id.* at 10:36–10:37 a.m. On cross examination, Deputy Flemming admitted that Salazar might have meant he was going to check in at the hotel, not the dealership. *Id.* at 10:56 a.m.

[63] *Id.* at 10:40 a.m.

[64] *Id.* at 10:44–10:47 a.m.

## B.    Lieutenant Hefley's Testimony

Lieutenant Hefley was the second and final witness to testify. He began by describing his training and experience, stating that he had worked with the Criminal Interdiction Team of Central Oklahoma since 2021 and was still assigned to that unit at the time of the October 26th stop.[65] He has served as a canine handler since 2006 and worked in that role with the team since 2022.[66]

Lieutenant Hefley also testified about Geri's training as a CLEET-certified drug-detection canine and his sniff of Salazar's vehicle. He explained that such canines are trained to alert to marijuana, cocaine, heroin, and methamphetamine, but may sometimes give a positive alert even when none of those narcotics are physically present in the vehicle because the occupants may have recently used or been around those substances.[67] Finally, he noted that handlers do not always rely on a dog's trained final response, such as a sit, to determine whether the dog is alerting.[68] Instead, they may look to "natural alert behaviors," such as increased interest or intensified sniffing in a particular area.[69] Lieutenant Hefley

---

[65] *Id.* at 11:23 a.m.

[66] *Id.* at 11:25 a.m.

[67] *Id.* at 11:28–11:29 a.m.

[68] *Id.* at 11:29–11:30 a.m.

[69] *Id.*

24

testified that Geri displayed these natural alert behaviors at the same area of the Ford Escape as Gofer.[70]

## *Discussion*

**I.    The Initial Stop.**

Salazar's first line of attack is on the stop itself. He maintains that he committed no traffic violation; Deputy Flemming maintains that he did not signal until the lane change was already underway. No dashcam captured the maneuver, so the question reduces to one of credibility.

A traffic stop is a seizure within the meaning of the Fourth Amendment and must be supported by reasonable suspicion that a traffic violation has occurred.[71] The officer's subjective motivation—here, drug interdiction—is beside the point so long as an objective traffic violation is observed.[72] The inquiry is whether "this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."[73]

Because there is no video of the disputed lane change, the validity of the stop rises or falls on Deputy Flemming's testimony. At the suppression hearing, Deputy Flemming

---

[70] *Id.* at 11:37–11:38 a.m.

[71] *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

[72] *Whren*, 517 U.S. at 813.

[73] *Botero-Ospina*, 71 F.3d at 787 (citation omitted).

testified that Salazar activated his turn signal simultaneously with—rather than at least 100 feet before—initiating the lane change, in violation of 47 Okla. Stat. § 11-309(2).[74] He further testified that he had an unobstructed view of Salazar's vehicle at the moment of the maneuver.[75] His hearing testimony is corroborated by his contemporaneous statement to Salazar at the roadside, captured on bodycam: "you can't hit your signal and then start going at the same time."[76] That the roadside explanation and the sworn testimony align on this point—and that Deputy Flemming articulated the violation in the same terms at each—lends his account the consistency that credibility findings require.

Salazar offers no evidence to the contrary. On this record, the Court credits Deputy Flemming's testimony that Salazar failed to signal the requisite distance before changing lanes.[77] That observation supplied reasonable suspicion of a violation of § 11-309(2), and reasonable suspicion of a traffic violation—however minor, and whatever the officer's ulterior interest in the vehicle's occupants—is all the Fourth Amendment requires to justify the initial seizure.[78]

---

[74] Apr. 10, 2026 Hr'g Audio at 10:20 a.m.

[75] *Id.* at 10:21 a.m.

[76] Bodycam Footage (Dkt. 36-2), at 2:03–2:11.

[77] The Court's credit of Deputy Flemming's testimony about the lane change does not extend automatically to every aspect of his account, and the Court evaluates each piece of his testimony on its own terms.

[78] *Whren*, 517 U.S. at 810; *Botero-Ospina*, 71 F.3d at 787.

The initial stop did not offend the Fourth Amendment. The Court accordingly turns to what followed.

## II.    The Extension of the Stop

Salazar's second challenge is to what happened after the initial stop: the open-air canine sniff, he argues, occurred only after Deputy Flemming had prolonged the detention beyond its traffic-related mission, and Deputy Flemming lacked reasonable suspicion of any new crime to justify the extension.[79]

The governing framework is well settled. A traffic stop, "justified only by a police-observed traffic violation," becomes "unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of addressing the violation.[80] An officer's authority to seize the driver "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."[81] That mission encompasses addressing the

---

[79] Salazar also contends that Deputy Flemming improperly used Salazar's refusal to give consent to the sniff search as part of his basis for reasonable suspicion. While Deputy Flemming's repeated invocation to other officers of Salazar's refusal to consent as a reason he was suspicious of Salazar indicates that Deputy Flemming gave that fact weight, the government insists that Deputy Flemming already had reasonable suspicion to conduct the open air sniff before he asked Salazar for his consent. In other words, the Government says the lack of consent—and any reliance by Deputy Flemming on the same—is irrelevant to the reasonable suspicion analysis. It would, of course, be impermissible for Deputy Flemming to use Salazar's denial to support reasonable suspicion. *See, e.g., United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

[80] *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (internal quotation marks omitted).

[81] *Id.* at 354.

violation itself, checking the driver's license, confirming registration and proof of insurance, and determining whether any warrants are outstanding.[82] Once the officer diverts from those tasks to "conduct general criminal interdiction or investigate other crimes,"[83] the diversion must be independently supported by reasonable suspicion—and it must be supported at the moment "the officer extended the stop by engaging in non-traffic inquiries."[84] Absent that justification, "even de minimis delays caused by unrelated inquiries violate the Fourth Amendment."[85]

Reasonable suspicion, in turn, demands "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[86] The inquiry is a totality-of-the-circumstances one, and innocent facts may combine to produce the requisite suspicion.[87] But "reasonable suspicion" is not a phrase without content. The factors on which the government relies must do real work; they cannot be "so innocent or susceptible to varying interpretations as to be innocuous,"[88] and they cannot be so generic that they

---

[82] *Id.* at 355.

[83] *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020) (citing *Rodriguez*, 575 U.S. at 356).

[84] *United States v. Frazier*, 30 F.4th 1165, 1179 (10th Cir. 2022).

[85] *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355-57).

[86] *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[87] *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

[88] *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

sweep in "a very large category of presumably innocent travelers."[89] An officer's hunch, however experienced, will not suffice.[90]

The Government concedes—as it must, on this record—that Deputy Flemming prolonged the stop beyond its traffic-related mission to conduct the canine sniff. The only question, then, is whether by that moment Deputy Flemming had developed reasonable suspicion of drug trafficking independent of the traffic violation that justified the stop in the first place.

The Government identifies three factors that it says, in combination, cleared that threshold: (1) Salazar's nervous demeanor, (2) Salazar's unusual travel plans and inability to recall a detail of those plans, and (3) Salazar's vehicle ownership (or lack thereof). The Court thus examines Salazar's demeanor, travel plans, and vehicle ownership in turn, mindful that the whole may exceed the sum of its parts, but equally mindful that a stack of innocuous facts does not become suspicious merely by being stacked.

### A.    Demeanor

Nervousness occupies a humble place in the reasonable-suspicion calculus, and for good reason: "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer."[91] Ordinary nervousness is therefore entitled to

---

[89] *Reid v. Georgia*, 448 U.S. 438, 441 (1980).

[90] *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

[91] *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (quoting *Wood*, 106 F.3d at 948) (internal quotation marks omitted).

little weight; only extreme nervousness carries the freight the Government asks it to bear here—and even then, not much, and not alone.[92] And an officer's bare assertion that a motorist was extremely nervous will not do. The claim must be anchored to objective, articulable facts demonstrating that the motorist's anxiety exceeded what any citizen might feel when pulled over on the shoulder of an interstate by an armed agent of the State.[93]

Deputy Flemming's effort to cast Salazar as extremely nervous fails on three independent grounds.

First, Deputy Flemming's own baseline is miscalibrated. On the video, he tells Salazar, "If I'm doing nothing wrong, I'm not nervous," and again, "I shouldn't make you nervous. I'm just another dude, right?"[94] That premise—that an innocent citizen feels no nervousness during a roadside encounter with law enforcement—is at war with the settled case law and with human experience. The Tenth Circuit has said so repeatedly,[95] and this Court will not adopt a standard under which the ordinary anxiety attending any police stop is itself evidence of crime. An officer who treats the absence of sangfroid as a badge of guilt converts a universal human reaction into evidence of a crime.

Second, Deputy Flemming's characterization of Salazar's demeanor is contradicted by the bodycam footage. Deputy Flemming testified that Salazar was "panting" and would

---

[92] *United States v. Williams,* 271 F.3d 1262, 1268 (10th Cir. 2001).

[93] *Id.*

[94] Bodycam Footage (Dkt. 36-2), at 12:14–13:12.

[95] *E.g.*, *United States v. Simpson*, 609 F.3d 1140, 1147–48 (10th Cir. 2010).

not make eye contact. But the video shows Salazar looking at Deputy Flemming dozens of times across the encounter and speaking throughout in an even, conversational tone. He occasionally looked away while fielding Deputy Flemming's rapid-fire questions, but nothing in that conduct suggests anxiety beyond the garden variety. His respiration seems elevated—as one would expect of any person seated inches from a deputy in a patrol car, with a drug dog in the back seat, being grilled about contraband. But he was not panting, hyperventilating, sweating, trembling, or otherwise exhibiting the physiological hallmarks of extreme nervousness. And while Deputy Flemming claimed that Salazar became nervous after noticing the drug dog behind him, the video does not reveal any marked change in demeanor at that moment.[96] When the tape and the testimony diverge, the tape controls.[97]

Third, and most troubling, much of whatever nervousness Salazar did display was of Deputy Flemming's own making. Deputy Flemming told Salazar that because California "doesn't do compacts" with Oklahoma, a $200 lane-change infraction could land him in jail. Salazar reacted as any reasonable person would: his eyes widened, he exclaimed "holy

---

[96] The Court also notes that Deputy Flemming's testimony on this point is seemingly contradicted by his roadside insistence to Salazar (when Salazar tried to explain to Deputy Flemming that Deputy Flemming had made him nervous by putting him in the patrol car and telling him he might go to jail) that Salazar was nervous from the moment he got into the patrol car.

[97] *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

cow," and he told Deputy Flemming that the warning had made him "really nervous."[98] When Salazar then tried to explain that it was Deputy Flemming's own words and conduct that were rattling him, Deputy Flemming waved the explanation away and pressed the point that an innocent man would not be nervous at all. The Government cannot have it both ways. An officer may not gin up anxiety by threatening a motorist with jail over a minor traffic violation and then invoke that officer-induced anxiety as evidence of criminality.

Even setting to one side Deputy Flemming's contributions to Salazar's unease, the objective, articulable facts do not establish that Salazar was extremely nervous. His nervousness is accordingly entitled to minimal weight in the reasonable-suspicion calculus.

### B.    Travel Plans

The Tenth Circuit has long recognized that "implausible travel plans can form a basis for reasonable suspicion."[99] But the operative word is *implausible*. Travel plans that are merely unusual or different from what the officer himself would choose are generally not enough.[100] *United States v. Wood* makes the point: an unemployed painter's decision

---

[98] Bodycam Footage (Dkt. 36-2), at 7:34–8:13.

[99] *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007).

[100] *Simpson*, 609 F.3d at 1149; *c.f. United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (reasoning that bizarre travel plans can be a factor in the reasonable suspicion analysis and finding bizarre travel plans where the defendant was driving from New Jersey to San Jose—a hub of the computer industry—to help a company, who refused to pay for his travel, with a time-sensitive computer server emergency). This case is distinguishable from *Ludwig*. Unlike the purportedly urgent, cross-country trip in *Ludwig*, Salazar's work assignment was not time-sensitive, involved travel only a few states from home, and, thus, does not "suggest[] that all was not as it seemed." *Ludwig*, 641 F.3d at 1249.

to drive a rental car one way across the country "to enjoy the scenery" after visiting California added little to the reasonable-suspicion calculus.[101]  So too in *United States v. Salzano*, where the defendant's choice to borrow a "gas-guzzling" motor home for a weekend jaunt from Michigan to Las Vegas reflected, at most, "a choice that the typical person, or the officer, would not make"—not a choice objectively indicative of "lies, evasions, or inconsistencies."[102] That distinction—between the subjectively atypical and the objectively implausible—controls this case.

The Government concedes, as it must, that Salazar "told a great story" that was "very convincing" and "pretty buttoned up." The bodycam bears that concession out. Salazar's account was consistent from first question to last, plausible on its face, and wholly innocuous: he was driving a Hewlett-Packard fleet vehicle, loaded with Hewlett-Packard computer parts, on a Hewlett-Packard work assignment; he had just finished a job in California and was headed to Oklahoma City to install a new computer system at a Ford dealership recently acquired by Lithia; and he had not yet booked a hotel for the night. Nothing in that narrative is unusual, let alone implausible or internally inconsistent.

The Government nevertheless isolates several details it brands suspicious: (1) Salazar had to look up the dealership's name on his phone; (2) he had not yet booked a hotel;  (3) he had traveled from California to Oklahoma City to "change out some computer

---

[101] *Wood*, 106 F.3d at 947.

[102] *Salzano*, 158 F.3d at 1114; *Simpson*, 609 F.3d at 1149.

parts"; and (4) he said he might "check in" with the dealership on a Sunday. The Court takes each fact in turn and finds each wanting.

*The Dealership's Name.* The Government leans heavily on Salazar's inability to recall, on the spot, the name of the dealership and his resort to Google to refresh his memory. Examined in context, the moment is unremarkable. Salazar was bound for an unfamiliar city, arriving on a Sunday night for a job that would not begin until Monday morning, and was headed in the first instance not to the dealership but to a hotel. That he could not conjure the dealership's name from memory—while readily identifying the parent company that had acquired it and explaining with precision the nature of the work he had been sent to perform—is the sort of minor memory lapse one would expect of any traveling professional, not a tell of criminal enterprise.

Deputy Flemming nonetheless casts the lapse as damning: "You drove all the way across the country not knowing where you're working. So like, if I leave California, which is 17 hours away . . . I've got an idea of where I'm going and what I'm doing."[103] The characterization cannot be squared with the record. Salazar *did* know where he was going—Oklahoma City, first to a hotel, then to a Ford dealership—and *did* know what he was doing—spending several days replacing the dealership's computer system on behalf of Lithia. His account was, moreover, independently corroborated by the vehicle he was driving (a Hewlett-Packard fleet car), its contents (Hewlett-Packard computer parts), and

---

[103] Bodycam Footage (Dkt. 36-2), at 12:14–13:12.

his direction of travel (east into Oklahoma City from California). Salazar knew "where he was going and what he was doing"; Deputy Flemming simply faulted him for not having memorized an incidental detail.

In any event, the inability to recall a client's business name is not suspicious. A traveling IT technician visiting an unfamiliar client location has no particular reason to commit the business name to memory, and having forgotten it, no reason not to Google it. Googling is the modern default for retrieving just such information. Treating recourse to a smartphone as evidence of criminality would effectively penalize the ordinary habits of the twenty-first-century traveler.

*The Absence of a Hotel Reservation.* The Government next emphasizes that Salazar had not yet booked a hotel. Deputy Flemming's stated basis for finding this suspicious was purely personal: "I used to travel for work. And if I was traveling a long distance, my hotel is already booked, and I know where I'm going to lay my head, especially after driving for 20 hours."[104] That Deputy Flemming prefers to book in advance says nothing about whether Salazar's approach was objectively unusual, much less objectively implausible. Many travelers—business and leisure alike—book on arrival, and many more do so from the road. Deputy Flemming's personal itinerary preferences are not a Fourth Amendment metric.[105]

---

[104] Apr. 10, 2026 Hr'g Audio at 10:34–10:35 a.m.

[105] *See Wood*, 106 F.3d at 947 (rejecting reliance on travel choices officer "would not make").

Compounding the incoherence, Deputy Flemming testified that he also found it suspicious that Salazar proceeded to book a hotel in his patrol car. That position is untenable on two independent grounds. First, Deputy Flemming conceded that he did not actually observe Salazar booking a room and doesn't actually know if he did—he just assumed as much from Salazar having told him, in response to a question from Deputy Flemming about whether he had a hotel booked, he was "going to get one right now at the Hilton."[106] The premise of the inference is thus based on speculation.

Second, even accepting that Salazar was in fact making a reservation from the passenger seat of the patrol car, Deputy Flemming failed to explain how that act bears on suspicion of drug trafficking. He testified only that it was "not normal" for a motorist he had pulled over to book a hotel during the stop. He did not testify—because he could not—that the behavior was consistent with what he had observed among prior drug traffickers, or that it was inconsistent with innocent travel. And to the extent the Government's theory is that Salazar's *lack* of a reservation suggested he was lying about his destination, his booking of a room in that very destination could have *dispelled* rather than deepened the suspicion. The Government cannot logically treat both the absence and the presence of a reservation as inculpatory; an inference that runs in every direction runs in none.

---

[106] Bodycam Footage (Dkt. 36-2), at 7:05–7:17.

*The Nature of the Job.* The Government next points to Salazar's having traveled all the way from California to "change out some computer parts," which Deputy Flemming found "odd." There are two problems with this.

First, the framing minimizes Salazar's actual description of the job. Salazar did not say he had come to swap out a single component; he explained that he would be spending several days replacing "all" of the newly acquired dealership's computer system. This was not a trivial errand for which a cross-country drive would seem disproportionate; it was a multi-day installation of the sort corporate IT departments routinely staff through regional technicians.

Second, Deputy Flemming supplied no objective foundation for his intuition that the arrangement was "odd." The record contains nothing to suggest he had any familiarity with how Hewlett-Packard staffs enterprise installations, or with whether such companies routinely dispatch technicians from California to jobs in the interior states. Absent such foundation, his assessment reduces to an untutored hunch—and a hunch, however sincerely held, is not reasonable suspicion.[107] On the face of it, nothing about a multi-day enterprise installation calling for an experienced technician is implausible. The factor is entitled to little weight.

---

[107] *See Terry*, 392 U.S. at 27.

*"Checking In" on a Sunday.* Finally, the Government contends that it was suspicious for Salazar to have said he might "check in" with the dealership on a Sunday, when dealerships are closed. The argument fails on three independent grounds.

First, the theory surfaced for the first time at the April 10 hearing. It is absent from Deputy Flemming's roadside conversation with Salazar, from his roadside exchanges with Sergeant Barton and Lieutenant Hefley, from his incident report, and from the Government's response brief. Its late emergence has the unmistakable scent of post hoc justification—a rationale reverse-engineered to fit a result, not a ground actually relied on in forming suspicion.

Second, Deputy Flemming himself acknowledged that Salazar may have been referring to checking in at a *hotel* rather than at the dealership. An ambiguity resolved against the officer's own concession does little to support suspicion.

Third, even taking the Government's reading at face value, "checking in" with a client on a Sunday is wholly explicable. Salazar said he would "check in today just to let them know I'm here" and begin the work "tomorrow morning."[108] A text, phone call, or email notifying a client of one's arrival requires no open showroom; it requires only a phone. That is true on Sundays as on any other day.

---

[108] Bodycam Footage (Dkt. 36-2), at 8:37–8:54.

In short, Salazar's stated plan to "check in" with the dealership was unremarkable, and the Government's eleventh-hour reliance on it underscores the thinness of the travel-plans theory as a whole. This factor, too, is entitled to little weight.

* * *

Taken individually, none of the travel-plan "red flags" the Government presses amount to much. Taken collectively, they amount to no more. What the record reveals is not an implausible story riddled with lies, evasions, and inconsistencies, but a consistent, corroborated, and altogether ordinary account of business travel that the Government itself characterized as "buttoned up." Salazar's travel plans do not meaningfully advance the reasonable-suspicion inquiry.

## C. Vehicle Ownership

The Government argues that Salazar's operation of a fleet vehicle was suspicious because drug traffickers often drive vehicles other than their own. The Tenth Circuit has indeed assigned some weight to the fact that a defendant was driving a vehicle not registered in his name.[109] But that factor usually draws its force from the inference that the driver cannot satisfactorily account for his possession of the vehicle—not from the bare fact of non-ownership where that non-ownership has been readily and reasonably explained.[110]

---

[109] *See, e.g.*, *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011).

[110] *See United States v. Pettit*, 785 F.3d 1374, 1382 (10th Cir. 2015) (finding reasonable suspicion where the defendant was driving a car registered to an absent third party).

Salazar accounted for his possession of the vehicle fully and credibly. He was driving a company car, loaded with company parts, while on company business. If the mere operation of an employer-provided vehicle were sufficient to raise suspicion of drug trafficking, every sales representative, service technician, and delivery driver on the interstate would be fair game for detention. Deputy Flemming offered no testimony tying Salazar's situation—an employee operating a marked company vehicle in the course of his duties—to the pattern he claimed to have observed in prior drug cases. The factor is, at most, marginally relevant, and is entitled to very little weight.

### D. Totality of the Circumstances

Having considered each of the Government's proffered factors in isolation, the Court now considers them together.[111] The whole may of course exceed the sum of its parts, but it does not do so here.

The factors on which the Government relies, taken as a package, might not be wholly inconsistent with drug trafficking, but they are not meaningfully indicative of it. Recall, the Government acknowledged that Salazar's story *differed* from that of the usual drug trafficker; Salazar's story was more "buttoned up." A man drove from California to Oklahoma in a company-issued fleet vehicle to perform a multi-day IT project. He could not, on the side of an interstate, recall the precise name of the dealership he was headed to without checking his phone; he had not pre-booked a hotel for a trip whose end date was

---

[111] *Arvizu*, 534 U.S. at 274.

uncertain; and, once placed in the front seat of a patrol car and told he might go to jail over a lane change, he grew anxious and avoided the deputy's eyes. These are the raw materials out of which the Government asks the Court to construct reasonable suspicion of drug trafficking. They will not bear the weight.

And while knowing the outcome of the search may make this feel like a close call, the Tenth Circuit has been clear that the factors an officer assembles must, in combination, "eliminate a substantial portion of innocent travelers."[112] The factors assembled here do not. A traveler who drives a work vehicle, who has to use his phone to refresh his memory of the name of his jobsite, who has not locked in his lodging, and who becomes nervous when detained by an armed officer with a drug dog who is threatening jailtime describes not a trafficker but a large swath of ordinary Americans on the road for work.

The Government's position, reduced to its essentials, is that ordinary behavior acquires a guilty gloss when viewed through the lens of an experienced interdiction officer, and that the accumulation of enough such glossed-over facts adds up to reasonable suspicion. But while reasonable suspicion is a modest threshold, it is a threshold, and it performs a constitutional function: it separates the citizen who may be detained and investigated from the citizen who may not. To hold that the factors presented here cleared it would be to lower the threshold to a formality and to expose the many Americans who

---

[112] *United States v. Neff*, 681 F.3d 1134, 1142 (10th Cir. 2012) (quoting *United States v. Brugal*, 209 F.3d 353, 359 (4th Cir. 2000) (en banc).

drive long distances for work—in vehicles they do not own, to destinations they cannot always name with precision, on schedules that do not always permit advance reservations—to the prolonged roadside investigation the Fourth Amendment was designed to prevent.

Viewing the whole picture, the Court concludes that Deputy Flemming did not have reasonable suspicion of drug trafficking at the moment he extended the stop to conduct the canine sniff. At best he had a hunch, and a hunch is not enough. The extension therefore violated the Fourth Amendment, and the fruits of the sniff and the search that followed must be suppressed.[113]

### *Conclusion*

A closing observation. Deputy Flemming's hunch was right. There were, in fact, nearly forty-nine pounds of fentanyl concealed in Salazar's vehicle. The temptation, knowing what we now know, is to pat Deputy Flemming on the back and call this good police work. The Court resists the temptation, for two reasons.

The first is that we see only the hunches that pay off. Deputy Flemming's instincts led him to a loaded car on this October morning, and the record of that success now sits before the Court. What the record does not show—what no record ever shows—is how many other motorists have been pulled to the shoulder of Interstate 40 for minor (and often quite subjective) traffic violations, peppered with questions by interdiction officers fishing

---

[113] Having so concluded, the Court need not reach the difficult question of whether the results of the open air sniff provided probable cause to search car.

for inconsistencies, searched after similarly iffy drug dog alerts, and sent on their way with nothing found and no suppression motion to memorialize the intrusion. A rule that credits hunches by their hits, while ignoring their misses, is not a rule at all. It is a lottery, and the Fourth Amendment was written to end the lottery, not to ratify its winners.

The second is that the exclusionary rule means what it says. It is a judge-made remedy, and it carries a judge-made cost: very good evidence of a very real crime will not be heard by the jury that would otherwise convict on it. That cost is borne, in this case and in others like it, by the public whose safety the drug laws exist to protect. The Court does not minimize the cost. But the cost is the price of the rule, and the rule is the price of the right. A Fourth Amendment that yielded whenever the search turned out to be fruitful would protect only the innocent and the lucky. And the innocent, by and large, rarely have need to invoke its protection. But the guilty do. Love it or hate it, that is the uncomfortable arithmetic of exclusion.

The Motion to Suppress (Dkt. 27) is **GRANTED**.

**IT IS SO ORDERED** this 18th day of May 2026.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

43